# IN THE SUPREME COURT OF IOWA

No. 16–0158

Filed June 15, 2018

**IN THE INTEREST OF T.H.,**
Minor Child.

**T.H.,** Minor Child,

      Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Woodbury County, Brian L. Michaelson, Senior Judge.

A juvenile statutorily required to register as a sex offender challenges the provision as cruel and unusual punishment under the Iowa and United States Constitutions. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Zachary S. Hindman of Mayne, Arneson, Hindman, Hisey & Daane, Sioux City, and Kathryn C. Stevens, Public Defender, Sioux City (until withdrawal) for appellant.

Thomas J. Miller, Attorney General, Mary A. Triick, Assistant Attorney General, and Diane Murphy, Assistant County Attorney, for appellee.

**CADY, Chief Justice.**

In this appeal, we must decide if substantial evidence was presented to establish that a juvenile committed a sex offense by force and whether the mandatory sex offender registry statute for certain juvenile sex offenders violates the prohibition against cruel and unusual punishment under either the Iowa or United States Constitution. The juvenile court found the juvenile committed a sex offense by force and ordered him to register as a sex offender. We transferred the appeal to the court of appeals. It found substantial evidence that the juvenile committed a sex offense by force and that the sex offender registry requirements imposed by law did not violate the prohibition against cruel and unusual punishment under either the Iowa or United States Constitution. On our further review from the court of appeals decision, we affirm the decision of the juvenile court and the decision of the court of appeals.

## I. Factual Background and Proceedings.

On or about July 15, 2015, T.H., a fourteen-year-old boy, knocked on the door of I.N., a sixteen-year-old girl whom T.H. had known for a few years. I.N. answered the door, and T.H. told her he had a gift for her. He told I.N. he had ordered a ring and wanted to give it to her. I.N. asked her mother if she could talk with T.H. on the front porch, and her mother gave her permission. Once the two were outside, they talked for a few minutes, and T.H. began to kiss I.N., over her objections. T.H. then sat on the porch and asked I.N. to join him. She initially refused, but T.H. continued to insist.

I.N. sat down on the porch next to T.H., who then exposed his penis and shoved the back of I.N.'s head downward toward it. I.N. protested repeatedly, and as she said "no," T.H.'s penis entered her

mouth. T.H. kept his hand on I.N.'s head so she could not raise her head. I.N. then bit T.H.'s penis in order to free herself, prompting T.H. to release her head. T.H. asked her why she had bit him, and I.N. responded that she did not want to do this and had said no. I.N. slapped T.H. in the face, and T.H. went home.

I.N. ran inside and told her mother what had happened. I.N.'s mother called the police. I.N. was interviewed by the police and a few days later interviewed by the Child Advocacy Center. The police also interviewed T.H. Although T.H. initially denied the incident, after an officer falsely represented to him that there was surveillance footage of the encounter, T.H. admitted to forcing I.N. to perform oral sex and that she bit him in the process. After the police interview, without an officer in the room, T.H. wrote an apology letter to I.N. He wrote,

> Dear [I.N.],
> I sorry for forcing you to suck my penis. I'm so sorry. If you forgive me, I'll be happy. So just remember I still care about you.
> Love, [T.H.]

Since the incident, I.N. has experienced recurring nightmares about the incident and is wary around boys who resemble T.H. She also has had difficulty participating in school when the topic of sexual abuse is discussed.

On July 21, 2015, the State filed a delinquency petition alleging the delinquency of T.H. based on a number of incidents. The State alleged T.H. committed sexual abuse in the third degree by performing a sex act by force or against the will of I.N. in violation of Iowa Code section 709.4(1)(*a*) (2016). Based on domestic incidents that occurred in late June 2015, the State also alleged two counts of simple assault for punching and choking his mother, one count of simple assault for

punching his brother, and one count of criminal mischief in the fifth degree for throwing a mop through a window of his residence.

The juvenile court held an adjudicatory hearing during which I.N. testified about the incident, as well as the detective who conducted the investigation. Following the witnesses' testimonies, the juvenile court dismissed the four counts relating to the domestic incidents. On December 11, the juvenile court adjudicated T.H. delinquent for performing a sex act by force and against the will of I.N. in violation of Iowa Code section 709.4(1)(*a*). The court, therefore, found that T.H. had committed sexual abuse in the third degree and that his offense was committed with force.

The court soon thereafter issued its dispositional order, which discussed T.H.'s mental health history, past behavioral problems, and prior rehabilitation efforts by the State. T.H.'s father has never played a role in his life, and his mother has been married three times. Her second husband was an alcoholic, and her third husband abused her, sometimes in T.H.'s presence. After the third husband left the home, T.H. kept in contact with him, as he provided drugs to T.H. and his friends. Currently, the man who is living in T.H.'s home is a multistate offender with prior arrests for narcotics possession, domestic violence, and child endangerment. T.H.'s mother has a history of substance abuse, although she has been sober for over seven years. She currently works the overnight shift at Wal-Mart. From 2004 to 2008, T.H. lived with his maternal grandmother and stepgrandfather in Texas, and they have since continued to request custody of T.H.

Prior to the incident with I.N., T.H. had received a number of services to address his mental health and behavioral needs. In August 2011, T.H. was removed from his home by the police and taken to

St. Luke's Hospital for aggressive behavior. In September 2011, he was placed in the Four Oaks PMIC Program and resided in the facility for seven months. In December 2012, T.H. was committed to the Cherokee Mental Health Institute (MHI) after threatening to stab kids at school with a paper knife, drawing pictures of shooting people and blowing up houses, and stating that voices in his head were telling him to do bad things. He remained at Cherokee MHI until February 2013, when he received a placement at the Boys and Girls Home in Sioux City. Through each of the out-of-home placements, T.H. was given services relating to anger management, coping mechanisms, age-appropriate social skills, communication skills, and self-esteem. T.H. was returned to his parental home in August 2013 with a good prognosis.

Beginning in January 2014, the Sioux City police were frequently called to assist with family disturbances in his home. T.H.'s mother struggled to contain T.H.'s behavior and sought assistance from juvenile officers and a therapist. In September 2014, after T.H. broke a window in the family home, he was placed on an Informal Adjustment and assigned twenty hours of community service. T.H.'s mother also pursued outpatient mental health services and medication for T.H. School liaison services were also added to support him at school. In June of 2015, police were twice called to address incidents within his home after T.H. punched his brother and mother and placed his mother in a choke hold during an argument. Juvenile officers discussed the possibility of a second Informal Adjustment, but opted to give T.H. one month to demonstrate his ability to live in the home without aggression. Less than a month later, T.H. was brought to detention for sexually abusing I.N.

After being placed in detention, T.H. completed two psychological evaluations. T.H. was diagnosed with a schizoaffective disorder, bipolar

type; an attention deficit/hyperactivity disorder, combined presentation; an oppositional defiant disorder, moderate; and an unspecified anxiety disorder. T.H. expressed a desire not to be returned to his parental home, stating he was afraid he would hurt his mother, brother, or do something sexual again.

Considering the above circumstances and T.H.'s history of prior services, the court concluded that it was in T.H.'s best interests to be placed in a residential treatment facility. The court ordered T.H. to be placed in the S.T.O.P. program at the Four Oaks facility where he would receive a number of services. The court also found that T.H.'s offense is a tier III sexual offense, and therefore, T.H. was required to register as a sex offender pursuant to Iowa Code section 692A.102(1)(*c*)(10). The court explained it had no discretion to defer or waive the sex offender registration requirements, as T.H. was fourteen years old and committed his offense with force. Accordingly, the court ordered T.H. to register as a sex offender pursuant to Iowa Code section 692A.103(4).

T.H. appealed and raised two issues. First, he asserted there was insufficient evidence to find he committed sexual abuse by force. Second, he argued the mandatory sex offender registration constituted cruel and unusual punishment in violation of both the Iowa and United States Constitutions. We transferred the case to the court of appeals. It concluded there was substantial evidence to support a finding that T.H. sexually abused I.N. by force. It also found that mandatory sex offender registration for juveniles was not cruel and unusual punishment.

We granted T.H.'s application for further review.

**II. Standard of Review.**

Juvenile delinquency proceedings are "special proceedings that provide an alternative to the criminal prosecution of children where the best interest of the child is the objective." *In re M.L.*, 868 N.W.2d 456, 460 (Iowa Ct. App. 2015). We consider the sufficiency of the evidence in juvenile delinquency adjudications de novo. *In re D.S.*, 856 N.W.2d 348, 351 (Iowa 2014). We review constitutional challenges de novo. *State v. Roby*, 897 N.W.2d 127, 137 (Iowa 2017).

**III. Analysis.**

**A. Sufficiency of Evidence.** A person commits sexual abuse in the third degree when the person performs a sex act under various circumstances, including when "[t]he act is done by force or against the will of the other person." Iowa Code § 709.4(1)(*a*). T.H. alleges the State introduced insufficient evidence that he committed a sex act "by force or against the will" of I.N.

The essence of the claim asserted by T.H. is built upon two propositions. First, he used the nature of their relationship to support the absence of any evidence of force. T.H. asserted he had been pursuing a relationship with I.N., they maintained a friendly relationship, they had spent time together alone in the past, I.N. never felt threatened or fearful during any past encounter, and he was invited by I.N. into her home to be alone with her at the time in question. Second, he claimed the testimony of I.N. about the event was both implausible and inconsistent, claiming the sex act that occurred was voluntary.

Upon our review of the transcript, we find substantial evidence to support the crime, including the element of force. I.N. testified T.H. forced her head into his erect penis, and she responded by repeatedly telling him "no." T.H. acknowledged to police that he forced I.N.'s head

down into his penis and that he asked her why she did not want to perform oral sex. Upon our de novo review, we also consider the findings of the juvenile judge who heard the testimony and evaluated the credibility of the witnesses. *In re A.K.,* 825 N.W.2d 46, 49 (Iowa 2013).

**B. Mandatory Juvenile Sex Offender Registration.** T.H. next argues that the mandatory sex offender registration requirement constitutes cruel and unusual punishment because the governing statute does not permit the juvenile court to waive the registration requirement for juveniles like himself who were found delinquent of a sex act under aggravated circumstances. He argues the constitutional protections entitle all juveniles to an individualized assessment by the juvenile court to determine if registration should be waived or imposed. T.H. builds his argument on those cases requiring an individualized hearing before sentencing juvenile offenders to imprisonment without parole. *See generally State v. Lyle,* 854 N.W.2d 378 (Iowa 2014); *State v. Ragland,* 836 N.W.2d 107 (Iowa 2013); *State v. Pearson,* 836 N.W.2d 88 (Iowa 2013); *State v. Null,* 836 N.W.2d 41 (Iowa 2013).

To address this argument, we must first determine the operation of the sex offender registry statute with respect to juvenile offenders. This task requires us to consider two statutory schemes: the sex offender registry statute and the statute governing the adjudication and disposition of juvenile offenders. Second, we will review the requirements of the sex offender registry statute as applied to T.H.

1. *Mandatory registration for certain juveniles.* The Iowa Sex Offender Registry statute broadly governs the registration of sex offenders in Iowa. Under the statute, any person "convicted" of an offense designated as a tier I, II, or III crime is required to register with the Iowa Sex Offender Registry. Iowa Code § 692A.103(1). Generally,

this registration requirement applies to juvenile offenders. Juveniles adjudicated delinquent of a qualifying offense are considered "convicted" for registration purposes. *Id.* § 692A.101(7).

Notwithstanding, the registration statute permits the juvenile court to "waive[] the registration" for juvenile offenders if it "finds that the person should not be required to register." *Id.* § 692A.103(3). Additionally, if a juvenile court does not initially waive the registration requirement, it may subsequently "modify or suspend the registration requirements" upon a showing of good cause prior to the discharge of a juvenile from the jurisdiction of the court. *Id.* § 692A.103(5).

Yet, the statute does not permit the juvenile court to waive the registration requirements, or modify or suspend the requirements, for juveniles fourteen years of age or older at the time of their sex offense and who committed their offense "by force or the threat of serious violence, by rendering the victim unconscious, or by involuntary drugging of the victim." *Id.* § 692A.103(4). If a juvenile commits a sex offense under these circumstances, the juvenile must register as a sex offender and may not petition the juvenile court to modify or suspend the registration requirements prior to the discharge from the jurisdiction of the court. *Id.* § 692A.103(5)(*e*). Accordingly, under the sex offender registration statute, juveniles who are found delinquent of an aggravated sex offense must register as sex offenders, and the requirement cannot be waived under the statute by the juvenile court.

The provisions of the sex offender registration statute, however, must be read in conjunction with the juvenile justice provisions of chapter 232. In particular, the statute governing dispositional orders for juvenile offenders directs the juvenile court to "determine whether [a] child shall remain on the sex offender registry prior to termination of the

dispositional order." *Id.* § 232.54(1)(*i*). Importantly, unlike the provisions governing the waiver of the registration requirement for juveniles, the authority of the juvenile court to determine if a juvenile should *remain* on the registry after the dispositional order terminates does not exclude juveniles who commit sex crimes under aggravated circumstances. Thus, an aggravated sex offender must initially register under the statute. However, any time a court acts to terminate a child's dispositional order that "require[d] [the] child to register as a sex offender pursuant to chapter 692A, the juvenile court shall determine whether the child shall remain on the sex offender registry prior to the termination of the dispositional order."[1] *Id.*

This approach is not only consistent with the language of chapter 692A and chapter 232, but it is also in line with the objective of the juvenile law. Retaining the juvenile court's jurisdiction is consistent with the research that shows juvenile sex offenders can achieve rehabilitation far easier than adult sex offenders. *See* Robert E. Shepherd Jr., *Advocating for the Juvenile Sex Offender, Part 1*, 21 Crim. Just. 53, 54 (2006) ("Adolescent sex offenders are far less predatory, are less likely to engage in serious or aggressive behaviors, are far more amenable to successful treatment, are more readily treated and supervised within the community, and have significantly lower recidivism rates."); *see also Roper v. Simmons*, 543 U.S. 551, 569–71, 125 S. Ct. 1183, 1195–96 (2005) (recognizing the "diminished culpability of juveniles" and their

---

[1]A dispositional order can automatically terminate by operation of law when a juvenile reaches a certain age or it can terminate at the hand of the juvenile court prior to its expiration. *See* Iowa Code § 232.53 (governing duration of dispositional orders). The requirement for the juvenile court to determine if a child shall remain on the sex offender registry only applies when the court terminates a dispositional order requiring the child to register as a sex offender "prior to its expiration." *Id.* § 232.54(1). Thus, if a dispositional order expires by operation of law, the juvenile offender remains on the sex offender registry.

greater capacity for rehabilitation); *Lyle*, 854 N.W.2d at 400 (noting a juvenile's "greater capacity for growth and reform"). Thus, the juvenile court is able to relieve a juvenile sex offender from the registration requirements when rehabilitation under a dispositional order is achieved prior to expiration.

2. *Sex offender registry requirements.* Generally, when a juvenile is required to register as a sex offender, the registration begins on the date the juvenile delinquent is released from placement in a juvenile facility; the date the juvenile delinquent begins attending a public or private education institution as a student; or the date of conviction if probation, incarceration, or placement in a juvenile facility was not ordered as a disposition. *See* Iowa Code § 692A.103(1). Once registration occurs, numerous restrictions and requirements are imposed. Thus, we turn to consider the impact of the registration requirements on T.H.

T.H. was fourteen years old at the time of his offense. In its delinquency adjudication, the juvenile court specifically found that T.H. committed the offense with force, as he used his hand to shove I.N.'s head toward his penis. Therefore, the juvenile court indeed lacked discretion to waive or defer his requirement to register as a sex offender, and it may not subsequently act to modify or terminate his registration requirement during the period of his dispositional order. For at least the duration of his dispositional order, T.H. must abide by the following terms of the sex offender registry.

T.H. must appear in person to register with the sheriff of each county where he resides, works, or attends school. *Id.* § 692A.104(1). If T.H. changes his residence, employment, or school he must notify the county sheriff within five business days. *Id.* § 692A.104(2). If T.H.

moves to, works in, or attends school in a new jurisdiction, he must notify the sheriff in the county of his principal residence of his presence in the new jurisdiction. *Id.* § 692A.104(5). If T.H. plans to leave the county for more than five days, he must notify the sheriff of his intentions and provide the location and period of time that he will be staying out of the county. *Id.* § 692A.105. Every three months, T.H. must appear in person to verify the location of his residence, employment, and school. *Id.* § 692A.108(1)(*c*). He will also pay an annual registration fee of twenty-five dollars. *Id.* § 692A.110(1).

Because T.H. committed an offense against a minor, he is subject to a number of exclusion zones and employment restrictions. He may not be present upon, nor loiter within 300 feet of, the property of an elementary or secondary school, except for the school he attends. *Id.* § 692A.113(1)(*a*)–(*b*). He similarly may not be present upon, nor loiter within 300 feet of, the property of a public library, absent prior written permission by the library administrator. *Id.* § 692A.113(1)(*f*)–(*g*). T.H. also may not be present upon, nor loiter within 300 feet of, the property of a child care facility, absent prior written permission by the facility. *Id.* § 692A.113(1)(*d*)–(*e*). T.H. may not loiter on the premises of any facility for dependent adults, nor may he be present at an event that provides services or programming for dependent adults. *Id.* § 692A.115(1). Finally, T.H. may not be present upon nor loiter within 300 feet of

> any place intended primarily for the use of minors including but not limited to a playground available to the public, a children's play area available to the public, a recreational or sport-related activity area when in use by a minor, a swimming or wading pool available to the public when in use by a minor, or a beach available to the public when in use by a minor.

*Id.* § 692A.113(1)(*h*).

Throughout the duration of his registration, T.H. may not work or volunteer for a "municipal, county, or state fair or carnival when a minor is present on the premises." *Id.* § 692A.113(3)(*a*). He also may not work or volunteer at a "children's arcade, an amusement center having coin or token operated devices for entertainment, or facilities providing programs or services intended primarily for minors, when a minor is present." *Id.* § 692A.113(3)(*b*). T.H. similarly may not work or volunteer at a "public or nonpublic elementary or secondary school, child care facility, or public library." *Id.* § 692A.113(3)(*c*). He is also prevented from working or volunteering at "any place intended primarily for use by minors including but not limited to a playground, a children's play area, recreational or sport-related activity area, a swimming or wading pool, or a beach." *Id.* § 692A.113(3)(*d*). He may not work or volunteer for any business that "operates a motor vehicle primarily marketing, from or near the motor vehicle, the sale and dispensing of ice cream or other food products to minors." *Id.* § 692A.113(3)(*e*). As well, T.H. may not be employed by a "facility providing services for dependent adults or at events where dependent adults participate in programming." *Id.* § 692A.115(1).

Because T.H. is a minor, he is not subject to any residency restrictions. *Id.* § 692A.114(3)(*e*). However, if T.H. is still required to register after becoming an adult, he will not be permitted to reside within 2000 feet of a school or child care facility. *Id.* § 692A.114(2). As well, should the juvenile court see fit, T.H. may be supervised by an electronic tracking and monitoring system. *Id.* § 692A.124(3).

T.H.'s registration information will be publicized on the sex offender registry website, which is searchable by "name, county, city, zip code, and geographic radius." *Id.* § 692A.121(1). The website will also publish T.H.'s full name, photographs, date of birth, home address,

and physical description, including scars, marks, or tattoos. *Id.* § 692A.121(2)(*b*)(1)(a)–(e). The website provides the statutory citation and text of his offense, as well as informs the public whether T.H. is subject to residence restrictions, employment restrictions, and exclusion zones. *Id.* § 692A.121(2)(*b*)(1)(f)–(h).

Members of the general public may also contact the county sheriff's office and request additional information about T.H. A member of the public that contacts the sheriff and provides T.H.'s date of birth, which is publicized on the sex offender registry website, may request a list of schools T.H. has attended, the names and addresses of his current and former employers, locations and dates of any temporary lodging, and his vehicle information. *Id.* § 692A.121 (5)(*a*)–(*b*).

If T.H. violates any of the above requirements, he commits an aggravated misdemeanor. *Id.* § 692A.111(1). Any subsequent violation is a class "D" felony. *Id.* Additionally, if T.H. violates a registration requirement, he must "register for an additional ten years, commencing from the date [his] registration would have expired." *Id.* § 692A.106(4). T.H.'s registration term will be tolled until he resumes compliance with the statutory requirements. *Id.* § 692A.107(2).

T.H. is required to register for at least the duration of his dispositional order. *Id.* § 232.54(1)(*i*). If the juvenile court determines that T.H. should remain on the registry beyond the duration of his dispositional order, T.H. will register for a minimum of ten years from the date of his initial registration. *Id.* § 692A.106(1). However, T.H. may petition for modification after five years if he satisfies a number of conditions. *Id.* § 692A.128(2). T.H. must complete all ordered sex offender treatment programs, submit to a risk assessment and be deemed a low risk to reoffend, not be incarcerated, and obtain a

stipulation to the modification from the director of the judicial district department of correctional services. *Id.* However, if T.H. is no longer under the juvenile court or department of correctional services' supervision at the time he requests modification, he need not produce the stipulation. *Id.* 692A.128(6). Accordingly, if T.H. abides by all of the registration requirements, completes all of the ordered treatment programs, and progresses to the point that he may be deemed a low risk to reoffend, he may be released from the obligation to register as a sex offender after five years.

**C. Cruel and Unusual Punishment.** T.H. alleges that mandatory sex offender registration, as applied to juveniles, is grossly disproportionate and, therefore, constitutes cruel and unusual punishment in violation of the Iowa and United States Constitutions. *See* U.S. Const. amend. VIII; Iowa Const. art. I, § 17. While we have previously heard similar challenges to the Iowa Sex Offender Registry scheme, we have not considered the issue in the context of juveniles, nor have we meaningfully considered a cruel and unusual punishment challenge in light of the significant legislative overhaul of the statutory scheme in 2009. Thus, while our prior sex offender cases are relevant considerations, they are not dispositive.

1. *Sex offender registry as punishment.* Before we can assess whether mandatory sex offender registration for certain juveniles is cruel and unusual, we must first determine that registration is, in fact, punishment. *See State v. Crooks,* 911 N.W.2d 153, 165 (Iowa 2018) (disposing of a constitutional challenge to Iowa's waiver provision for youthful offenders by concluding the statute was not punitive); *see also Doe v. Miller,* 405 F.3d 700, 723 n.6 (8th Cir. 2005) ("In view of our conclusion that the statute is not punitive, it follows that the law is not a

'cruel and unusual punishment' in violation of the Eighth Amendment."); *Rainer v. State*, 690 S.E.2d 827, 828 (Ga. 2010) (finding sex offender registration did not constitute cruel and unusual punishment because registration is regulatory, rather than punitive, in nature).

To determine whether mandatory sex offender registration for certain juveniles is punishment, we find cases considering the issue in the context of ex post facto challenges instructive. In *State v. Seering*, we considered whether the 2000-foot residency restriction for certain offenders was sufficiently punitive to violate the ex post facto prohibition. 701 N.W.2d 655, 667 (Iowa 2005). To ascertain whether the provision was sufficiently punitive, we first considered whether the legislature intended the statute to be punitive, rather than civil, in nature. *Id.* "If the law was intended to be civil and nonpunitive, then we look to see if it is nevertheless 'so punitive either in purpose or effect as to negate' the nonpunitive intent." *Id.* (quoting *Smith v. Doe*, 538 U.S. 84, 92, 123 S. Ct. 1140, 1147 (2003)).

Accordingly, we first consider whether, in mandating registration for juveniles over the age of fourteen who commit their crimes "by force or the threat of serious violence, by rendering the victim unconscious, or by involuntary drugging of the victim," the legislature intended to impose criminal punishment. Iowa Code § 692A.103(4). We have previously determined the legislative intent behind enacting chapter 692A was "to protect the health and safety of individuals, especially children, not to impose punishment." *Seering*, 701 N.W.2d at 667; *see also In re S.M.M.*, 558 N.W.2d 405, 408 (Iowa 1997) ("The purpose of chapter 692A is clear: to require registration of sex offenders and thereby protect society from those who because of probation, parole, or other release are given access to members of the public.").

Prior to 2009, the statute granted juvenile courts discretion with respect to all juveniles adjudicated delinquent of a qualifying offense. *See* Iowa Code § 692A.2(6) (2007) ("A person who is convicted . . . of [a qualifying offense] as a result of adjudication of delinquency in juvenile court shall be required to register as required in this chapter unless the juvenile court finds that the person should not be required to register under this chapter."). In 2009, the legislature amended chapter 692A and revoked that discretion with respect to juveniles like T.H., who were at least fourteen years old at the time of their offense and who committed their offense through certain aggravated means. 2009 Iowa Acts ch. 119, § 3 (codified at Iowa Code § 692A.103 (Supp. 2009)).

The legislature amended the chapter in an effort to more closely comply with the Federal Sex Offender Registration and Notification Act (SORNA), Title I of the Adam Walsh Child Protection and Safety Act of 2006. *Maxwell v. Iowa Dep't of Pub. Safety*, 903 N.W.2d 179, 185 n.4 (Iowa 2017); *see generally* 2009 Iowa Acts ch. 119 (amending Iowa Code ch. 692A). SORNA requires juveniles to abide by the registry requirements, including possible lifetime registration, if the juvenile was "14 years of age or older at the time of the offense and the offense adjudicated was comparable to or more severe than aggravated sexual abuse." 34 U.S.C. § 20911(8) (Westlaw through Pub. L. No. 115-173). *But see id.* § 20927(b)(1) (providing a state may avoid a noncompliance penalty if implementing certain SORNA provisions "would place the jurisdiction in violation of its constitution, as determined by a ruling of the jurisdiction's highest court"). SORNA was promulgated "[i]n order to protect the public from sex offenders and offenders against children." *Id.* § 20901. Thus, although the provisions have been amended since our

decisions in *Seering* and *S.M.M.*, we believe the legislative intent behind our current sex offender statute remains protective and nonpunitive.

Nevertheless, we also consider whether the effects and impact of chapter 692A on juveniles is sufficiently punitive to render the scheme penal in nature. In this inquiry, we are guided by the *Mendoza-Martinez* factors, which consider whether (1) "the sanction involves an affirmative disability or restraint," (2) "it has historically been regarded as a punishment," (3) "it comes into play only on a finding of scienter," (4) "its operation will promote the traditional aims of punishment—retribution and deterrence," (5) "the behavior to which it applies is already a crime," (6) "an alternative purpose to which it may rationally be connected is assignable for it," and (7) "it appears excessive in relation to the alternative purpose assigned." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69, 83 S. Ct. 554, 567–68 (1963).

a. *Affirmative disability or restraint.* Chapter 692A, as applied to juveniles, plainly imposes an affirmative disability or restraint. As discussed, juvenile registrants are hindered in meaningfully reintegrating into their communities upon release from treatment facilities or out-of-home placements. While juvenile registrants may continue to attend public school and are not subject to the 2000-foot limitation, they nevertheless may not be present upon, nor loiter within 300 feet of, "any place intended primarily for the use of minors." Iowa Code § 692A.113(1)(*h*) (2016).

This restriction could prevent juveniles from participating in prosocial after-school activities, sports teams, and youth clubs that are available to their peers, which in turn severely limits their opportunities to develop communication and social skills with children their own age. Further, juveniles may not visit or loiter near public libraries, other

elementary or secondary schools, and child care facilities. *Id.* § 692A.113(1)(*a*)–(*g*). Juveniles who hope to obtain after-school or part-time employment are similarly limited in their options. *See id.* §§ 692A.113(3)(*a*)–(*e*), .115. Thus, the statute in many respects isolates juvenile registrants from their peers outside of school hours.

Beyond actual exclusion zones, juvenile registrants must appear, in person, to register with the sheriff of the county in which they reside, attend school, or work. *Id.* § 692A.104(1). Juveniles like T.H. who were adjudicated of a tier III offense must appear in person *every three months* to verify their residence, employment, and school. *Id.* § 692A.108(1)(*c*); *cf. Smith*, 538 U.S. at 101–02, 123 S. Ct. at 1151–52 (finding Alaska's sex offender statute did not require in-person updates and, therefore, did not impose an affirmative restraint). In fact, the statutory scheme, which requires in-person check-ins, employment conditions, and the possibility of electronic monitoring, is strikingly similar to supervised probation. Despite the protective purpose of the registry's requirements, the totality of the obligations under the statute impose an affirmative restraint on juvenile registrants. This factor therefore weighs in favor of finding the statute punitive.

b. *Historically regarded as punishment.* We next consider whether compliance with the sex offender registry, for juveniles, entails conduct that is historically regarded as punitive. In *Seering*, we considered whether the 2000-foot rule was sufficiently akin to banishment. 701 N.W.2d at 667. We found the rule "only restricts sex offenders from residing in a particular area. Offenders are not banished from communities and are free to engage in most community activities. The statute is far removed from the traditional concept of banishment." *Id.* at 667–68.

In *Smith*, the Supreme Court considered an ex post facto challenge to Alaska's sex offender scheme. The Court rejected the comparison of Alaska's statutory requirements to banishment and public shaming. *Smith*, 538 U.S. at 98, 123 S. Ct. at 1150. The Court noted that colonial-era practices that required offenders to "stand in public with signs cataloguing their offense," branded murders with an "M" or thieves with a "T," and outright banished offenders from their original community, all involved "stag[ing] direct confrontation between the offender and the public." *Id.* at 97–98, 123 S. Ct. at 1150 (quoting Adam J. Hirsch, *From Pillory to Penitentiary: The Rise of Criminal Incarceration in Early Massachusetts*, 80 Mich. L. Rev. 1179, 1226 (1982) (first quote)). Indeed, punishments "such as public shaming, humiliation, and banishment, involved more than the dissemination of information. They either held the person up before his fellow citizens for face-to-face shaming or expelled him from the community." *Id.* The stigma resulting from Alaska's sex offender laws, however,

> results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public. Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment. On the contrary, our criminal law tradition insists on public indictment, public trial, and public imposition of sentence. Transparency is essential to maintaining public respect for the criminal justice system, ensuring its integrity, and protecting the rights of the accused. The publicity may cause adverse consequences for the convicted defendant, running from mild personal embarrassment to social ostracism. In contrast to the colonial shaming punishments, however, the State does not make the publicity and the resulting stigma an integral part of the objective of the regulatory scheme.

*Id.* at 98–99, 123 S. Ct. at 1150.

While the dissemination of accurate information about a criminal record is not historically punitive for adults, juveniles are traditionally shielded from such publication. Under the juvenile court's jurisdiction, juveniles surrender certain procedural safeguards afforded to adults—namely a trial by jury—in exchange for the benefits of a confidential, rehabilitative system. Juvenile courts were built on the "idea [that] crime and punishment [were] to be abandoned. The child was to be 'treated' and 'rehabilitated' and the procedures, from apprehension through institutionalization, were to be 'clinical' rather than punitive." *In re Gault*, 387 U.S. 1, 15–16, 87 S. Ct. 1428, 1437 (1967). By sealing records, juvenile courts prevent youths from enduring lasting stigma for adolescent blunders.

In Iowa, juvenile courts generally exercise "exclusive original jurisdiction in proceedings concerning a child who is alleged to have committed a delinquent act unless otherwise provided by law." Iowa Code § 232.8(1)(*a*). Unless a juvenile committed "a delinquent act that would be a forcible felony if committed by an adult," juvenile court records are, by default, "confidential and are not public records." *Id.* § 232.147(2) (2017). Indeed, even if a juvenile is alleged to have committed an act that would be a forcible felony if committed by an adult, juvenile courts may still order that the juvenile's court records be kept confidential if "the child's interest in making the records confidential outweighs the public's interest in the records remaining public records." *Id.* § 232.149A(1)(*b*).

However, under a limited set of circumstances, juveniles may be prosecuted as adults and thus lose the confidentiality benefits of the juvenile system. The juvenile court must find that (1) the child is at least fourteen years old, (2) there is probable cause the child committed a

delinquent act, and (3) "there are not reasonable prospects for rehabilitating the child if the juvenile court retains jurisdiction . . . and that waiver . . . would be in the best interests of the child and the community. *Id.* § 232.45(6)(*a*)–(*c*) (2016). Thus, under our dual system, children are only removed from juvenile court jurisdiction and treated as adults when they are deemed to be deserving of punishment, rather than rehabilitative services.

In *United States v. Juvenile Male*, the United States Court of Appeals for the Ninth Circuit similarly acknowledged this distinction between juvenile confidentiality and adult publication. 590 F.3d 924, 937 (9th Cir. 2009), *vacated on other grounds by* 564 U.S 932, 937–39, 131 S. Ct. 2860, 2864–65 (2011). Whereas *Smith* noted that much of the disseminated information was already made public by virtue of the intentionally public criminal trial, the Ninth Circuit emphasized that "public availability of information is *not*, however, a traditional part of the rehabilitative juvenile justice system." *Id.* Indeed, the court found "[h]istorically, information from juvenile adjudications has been made public only when a juvenile's case is transferred to adult criminal court for *punitive purposes.*" *Id.* Because the decision to transfer a juvenile's case to adult court is "based in part on a prediction that rehabilitation is improbable," and that "juvenile's case merits punishment, rather than rehabilitation," publicizing a juvenile offender's identity and offense "is historically a central feature of a punitive rather than a rehabilitative system of justice." *Id.*

Other courts have concluded the registry's requirements are historically punitive. In *In re Nick H.*, the Maryland Court of Special Appeals found "requiring [the juvenile] to register has essentially the same effect on his life as placing him on probation. It is well-settled in

this State that probation is a form of a criminal sanction." 123 A.3d 229, 244 (Md. Ct. Spec. App. 2015) (quoting *Doe v. Dep't of Public Safety & Corr. Servs.*, 62 A.2d 123, 139 (Md. 2013) (plurality opinion)). Further, the court noted the "purpose of keeping [juvenile] records confidential is to further the rehabilitation of young offenders by relieving them of the enduring stigma of their misconduct." *Id.* (alteration in original) (quoting *District of Columbia v. Cooper*, 483 A.3d 317, 323 (D.C. 1984)); *cf. In re C.P.*, 967 N.E.2d 729, 735, 749 (Ohio 2012) (noting the sex offender registry "changes the very nature of [a serious youth offender] disposition, imposing an adult penalty immediately upon the adjudication" and ultimately concluding the juvenile registration regime is unconstitutional).

Beyond the mere availability of a juvenile's records, the sex offender statute orders the mass publication of an offender's information to the state sex offender website. The Supreme Court considered this feature in *Smith*, but remained unmoved.

> The fact that Alaska posts the information on the Internet does not alter our conclusion. It must be acknowledged that notice of a criminal conviction subjects the offender to public shame, the humiliation increasing in proportion to the extent of the publicity. And the geographic reach of the Internet is greater than anything which could have been designed in colonial times. These facts do not render Internet notification punitive. The purpose and the principal effect of notification are to inform the public for its own safety, not to humiliate the offender. Widespread public access is necessary for the efficacy of the scheme, and the attendant humiliation is but a collateral consequence of a valid regulation.
>
> The State's Web site does not provide the public with means to shame the offender by, say, posting comments underneath his record. An individual seeking the information must take the initial step of going to the Department of Public Safety's Web site, proceed to the sex offender registry, and then look up the desired information. *The process is more analogous to a visit to an official archive of criminal records than it is to a scheme forcing an offender to*

*appear in public with some visible badge of past criminality.* The Internet makes the document search more efficient, cost effective, and convenient for Alaska's citizenry.

538 U.S. at 99, 123 S. Ct. at 1150–51 (emphasis added).

However, the *Smith* reasoning is less persuasive in 2018 than it was in 2003. In *Commonwealth v. Perez,* Judge Donohue of the Pennsylvania Superior Court offered a thoughtful concurrence on the viability of *Smith*'s reasoning in the modern, interconnected world.

> The environment has changed significantly with the advancements in technology since the Supreme Court's 2003 decision in *Smith.* As of the most recent report by the United States Census Bureau, approximately 75 percent of households in the United States have internet access. Yesterday's face-to-face shaming punishment can now be accomplished online, and an individual's presence in cyberspace is omnipresent. The public internet website utilized by the Pennsylvania State Police broadcasts worldwide, for an extended period of time, the personal identification information of individuals who have served their "sentences." This exposes registrants to ostracism and harassment without any mechanism to prove rehabilitation—even through the clearest proof. In my opinion, the extended registration period and the worldwide dissemination of registrants' information authorized by SORNA now outweighs the public safety interest of the government so as to disallow a finding that it is merely regulatory.

97 A.3d 747, 765–66 (Pa. Super. Ct. 2014) (Donohue, J., concurring) (footnote omitted). Similarly, the court in *Nick H* found "[p]ublishing information about former juvenile sex offenders on a public website hardly provides confidentiality, and instead creates the 'enduring stigma of their misconduct.'" 123 A.3d at 244 (quoting *Cooper,* 483 A.3d at 323).

We find that mass publication of a juvenile's delinquency adjudication weighs in favor of finding the statute punitive. Juveniles are traditionally shielded from having their records publicized unless they are deemed to be in need of punishment and beyond rehabilitation.

While a passive website is indeed different from colonial-era public shaming designed to create face-to-face encounters with the public, we disagree with the *Smith* Court's characterization of the website being akin to an archive of criminal records. Posting juveniles' personal information, including their full name, date of birth, annual photographs, home address, and physical description—including scars, marks, and tattoos—goes well beyond merely unsealing previously confidential records. The juvenile is publically branded as deviant on a website known to and accessible by the juvenile's peers. While T.H.'s period of registration may be less than an adult's, a member of the public need only take a screen shot of the website to preserve T.H.'s presence forever—a possibility that is antithetical to the traditional treatment of juveniles within our justice system.

c. *Scienter requirement.* The third factor, whether the regulations are triggered upon a finding of scienter, was deemed to be "of little weight" to the Supreme Court's decision in *Smith.* 538 U.S. at 105, 123 S. Ct. at 1154. Indeed, we did not identify this factor as a relevant consideration in *Seering,* 701 N.W.2d at 667.

Other courts, however, have considered this factor in the context of sex offender registries. In *Nick H.*, the Maryland statute instructed that juveniles must register only if the court determined they posed a significant risk of reoffending. 123 A.3d at 244–45. The court found a "determination that the juvenile sex offender is at significant risk of re-offending logically implies that the juvenile court must find a significant risk of future criminal intent on the part of the juvenile offender." *Id.* at 244. The statute imposed no such prerequisite finding on adult offenders. *Id.* Accordingly, the court found the scienter factor to weigh in favor of the statute being punitive. *Id.* at 245.

Under Iowa's scheme, some juveniles are required to register pursuant to the court's discretion, and such a determination may require weighing the juvenile's intent to recommit. With respect to juveniles at issue in this case, however, there is no finding of scienter that triggers registration. Juveniles like T.H. must register, regardless of their risk of reoffending. Thus, the lack of a scienter requirement weighs in favor, albeit marginally, of finding the statute nonpunitive. *See State v. Eighth Judicial Dist. Ct. (Logan D.)*, 306 P.3d 369, 387–88 (Nev. 2013) (finding juvenile registration was not premised on a scienter requirement and agreeing with the Supreme Court that the factor is "of little weight" to the analysis).

d. *Promote traditional aims of punishment—retribution and deterrence.* In *Smith*, the Court found "any number of governmental programs might deter crime without imposing punishment. *Smith*, 538 U.S. at 102, 123 S. Ct. at 1152. Indeed, "[t]o hold that the mere presence of a deterrent purpose renders such sanctions 'criminal' . . . would severely undermine the Government's ability to engage in effective regulation." *Id.* (second alteration in original) (quoting *Hudson v. United States*, 522 U.S. 93, 105, 118 S. Ct. 488, 496 (1997)). Further, the Supreme Court found that Alaska's decision to impose greater reporting requirements on repeat and aggravated offenders was not retributive, but rather "reasonably related to the danger of recidivism." *Id.*

Justice Souter concurred in the *Smith* decision, but expressed doubt that registration requirements purely served a protective purpose.

> The fact that the Act uses past crime as the touchstone, probably sweeping in a significant number of people who pose no real threat to the community, serves to feed suspicion that something more than regulation of safety is going on; when a legislature uses prior convictions to impose burdens that outpace the law's stated civil aims, there is

room for serious argument that the ulterior purpose is to revisit past crimes, not prevent future ones.

*Id.* at 109, 123 S. Ct. at 1155–56 (Souter, J., concurring in judgment). He further suspected that retribution was in fact a goal of the Alaska legislature, and other legislatures, when enacting sex offender statutes.

> Widespread dissemination of offenders' names, photographs, addresses, and criminal history serves not only to inform the public but also to humiliate and ostracize the convicts. It thus bears some resemblance to shaming punishments that were used earlier in our history to disable offenders from living normally in the community. While the Court accepts the State's explanation that the Act simply makes public information available in a new way, the scheme does much more. Its point, after all, is to send a message that probably would not otherwise be heard, by selecting some conviction information out of its corpus of penal records and broadcasting it with a warning. Selection makes a statement, one that affects common reputation and sometimes carries harsher consequences, such as exclusion from jobs or housing, harassment, and physical harm.

*Id.* (citations omitted).

In *Seering*, we explained, "The nature of some governmental restrictions, especially those designed to protect the health and safety of children, may necessarily have some effects related to the goals of punishment." 701 N.W.2d at 668. We concluded any deterrent or retributive effects of the 2000-foot rule were "secondary and largely 'consistent with the regulatory objective.'" *Id.* (quoting *Smith*, 538 U.S. at 102, 123 S. Ct. at 1152 (majority opinion)).

In *Logan D.*, the Nevada Supreme Court considered whether juvenile registration promoted retribution by assigning more stringent registration requirements based on the offense committed, rather than the juvenile's individual risk to reoffend. 306 P.3d at 385. According to the juvenile, if heightened registration requirements were intended to guard against recidivism, they would be associated with individualized

risk-assessments, rather than the prior offense. *Id.* The Nevada Supreme Court rejected this characterization. *Id.* Like the Supreme Court in *Smith,* the court found the "scheme of offense-based tiering is consistent with the statute's goal of protecting the public from recidivist juveniles [and] it is reasonable to conclude that juvenile offenders who have committed the most severe offenses pose the greatest risk to the public." *Id.* (footnote omitted).

We find this factor weighs in favor of finding the statute nonpunitive. While the registry certainly produces deterrent and retributive effects, requiring juvenile offenders to abide by exclusion zones and employment restrictions directly promotes the civil objective of alerting the public to the presence of a sexual offender. Although the severity of the requirements may incidentally deter individuals from committing an initial offense, that fact does not detract from the primary purpose and effect of the statute, which is reducing the opportunities for juveniles who have committed aggravated sexual offenses to reoffend.

e. *Applies to behavior that is already criminal.* Like the scienter factor, the *Smith* Court did not find this factor to be useful in its analysis, and we similarly did not consider it in *Seering. See Smith* 538 U.S. at 105, 123 S. Ct. at 1154; *Seering,* 701 N.W.2d at 667. The Court in *Smith* conceded that the "regulatory scheme applies only to past conduct, which was, and is, a crime," but nevertheless reasoned that "[t]his is a necessary beginning point, for recidivism is the statutory concern." 538 U.S. at 105, 123 S. Ct. at 1154.

In *Young v. State,* the Maryland Court of Appeals was similarly unpersuaded by the use of a criminal conviction to trigger the registry's requirements. 806 A.2d 233, 249 (Md. 2002).

> There are many occasions when legislatures attach both criminal and civil sanctions to the same act or omission. The fact that the statute is triggered by a criminal conviction does not undermine the Legislature's intent to create a sex offender registry to aid in the civil purpose of tracking the location of known sex offenders. The same is true as to restitution. Thus, although the connection between sex offender registration and past criminal behavior is clear, we accord only limited weight to this factor in light of the equally strong connection between registration and legitimate civil purposes.

*Id.*

The Iowa sex offender registry statute hinges upon a criminal conviction, and thus applies to conduct that is already a crime. However, we find *Smith* reasoning persuasive. When reducing recidivism is the nonpunitive goal, using a conviction of a sexual offense is a natural and nonsuspect means of achieving that goal. Thus, while this factor weighs in favor of finding the scheme punitive, it does so only slightly.

f. *Rationally related to a nonpunitive purpose.* We next consider whether mandatory sex offender registration for certain juveniles has a rational relationship to a civil purpose. In *Seering*, we found that, while the 2000-foot rule "has some punitive impact . . . this factor underscores that a statute is not punitive merely 'because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance.'" 701 N.W.2d at 668 (quoting *Smith,* 538 U.S. at 103, 123 S. Ct. at 1152). Mandatory registration for juveniles who have committed aggravated sexual offenses clearly has a rational connection to the nonpunitive goal of protecting the community, especially children, from subsequent sexual offenses. Accordingly, this factor weighs in favor of finding the statute nonpunitive.

g. *Excessive in relation to the nonpunitive purpose.* The final *Mendoza-Martinez* factor is the most significant of the seven, as it considers whether the legislature's chosen means to carry out its legitimate interests are so excessive as to cross the line from a civil regulation to a criminal punishment. *See Wallace v. State*, 905 N.E.2d 371, 383 (Ind. 2009) (placing the greatest weight on this factor); *Kellar v. Fayetteville Police Dep't*, 5 S.W.3d 402, 409 (Ark. 1999) (same). Importantly, the excessive inquiry "is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Smith*, 538 U.S. at 105, 123 S. Ct. at 1154.

In *Smith*, the Supreme Court placed significant weight on the risk of recidivism. The Court explained "the [Alaska] legislature's findings are consistent with grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class. The risk of recidivism posed by sex offenders is 'frightening and high.' " *Id.* at 103, 123 S. Ct. at 1153 (quoting *McKune v. Lile,* 536 U.S. 24, 34, 122 S. Ct. 2017, 2025 (2002)). Indeed, "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." *McKune*, 536 U.S. at 33, 122 S. Ct. at 2024) (citing Bureau of Justice Statistics, U.S. Dept. of Justice, *Sex Offenses and Offenders* 27 (1997); Bureau of Justice Statistics, U.S. Dept. of Justice, *Recidivism of Prisoners Released in 1983* 6 (1997)); *accord Smith,* 538 U.S. at 103, 123 S. Ct. at 1153. In light of this serious risk, the *Smith* Court reasoned "the State can dispense with individual predictions of future dangerousness and allow the public to assess the risk on the basis of accurate, nonprivate information about

the registrants' convictions without violating the prohibitions of the *Ex Post Facto* Clause." 538 U.S. at 104, 123 S. Ct. at 1153.

Yet, research published since the *Smith* decision in 2003 demonstrates that juvenile sex offenders exhibit drastically lower recidivism rates than their adult counterparts. The Iowa Sex Offender Research Council issued a report in 2013 that outlined the modern research. Div. of Criminal & Juvenile Justice Planning, Iowa Dep't of Human Rights, *Iowa Sex Offender Research Council Report to the Iowa General Assembly* 12 (2013), https://humanrights.Iowa.gov/ sites/default/files/media/SORC_1-15-13_Final_Report_%5B1%5D.pdf, [https://web.archive.org/web/20170323233135/https://humanrights. iowa.gov/sites/default/files/media/SORC_1-15-13_Final_Report[1].pdf]. The Council explained "studies have found extremely low rates of sexual reoffending for juveniles and that sexual reoffending rates are much lower than non-sexual re-offenses even among high-risk juveniles committed to correctional facilities." *Id.* (citations omitted). Juvenile recidivism "for general delinquent behavior ranged from 8% to 58%, while recidivism for sex offenders fell at 5% to 14%." *Id.*

With respect to the effectiveness of sex offender registration, multiple studies "have shown *no significant difference* in re-offense rates between registered and non-registered juveniles." *Id.* (emphasis added). Moreover, juvenile

> registration laws influence adjudication and charging practices. Fewer juveniles are adjudicated for mandatory registration offenses after laws requiring registration have gone into effect. As new policies apply harsher consequences for juvenile offenses, prosecutors become less likely to move forward on sexual assault charges. Additionally, after registry policy changes, the proportion of sex offense charges that were reduced to less severe charges increased significantly.

*Id.* Thus, juvenile recidivism is largely unaffected by the exclusion zones and employment restrictions of the sex offender statute. What *is* most affected by mandatory juvenile registration, then, is not the likelihood of reoffending, but rather the likelihood that a juvenile will be charged with or adjudicated delinquent of a sexual offense at all.

Furthermore, the "criminal sexual behaviors of adult sex offenders appear to be more 'the result of deeply ingrained and long-standing pathology.'" Phoebe Geer, *Justice Served? The High Cost of Juvenile Sex Offender Registration*, 27 Dev. Mental Health L. 34, 42 (2008) (quoting Ayn Embar-Seddon & Allan D. Pass, *Assessing, Managing, and Treating Juvenile Sexual* Offenders, 2004 J. Inst. Just. Int'l Stud. 112, 114 (2004)). Juvenile offenses, conversely, "appear to be more exploratory in nature than those committed by adults and to not signify permanent sexual deviance." *Id.* "[S]tudies suggest that many of those who commit sexual offenses as juveniles do so as a result of impulsivity and sexual curiosity, which diminish with rehabilitation and general maturation." *In re J.B.*, 107 A.3d 1, 17, 20 (Pa. 2014) (finding SORNA's lifetime registration provision unconstitutional as applied to juveniles).

*Smith*'s premise that the "frightening and high" rates of recidivism justify the harsh impositions of the sex offender regime has proven untrue in the context of juveniles. Indeed, the primary justification for the sex offender registry—protecting the public from individuals especially prone to reoffending—is substantially diminished with respect to juvenile offenders. *See Wallace*, 905 N.E.2d at 383 ("[R]egistration systems are a legitimate way to protect the public from sex offenders. Of course if the registration and disclosure are not tied to a finding that the safety of the public is threatened, there is an implication that the Act is excessive.").

Ultimately, automatically registering certain juveniles, and thus publically branding them as aberrant and widely disseminating their personal information, "makes more burdensome the punishment for a crime after its commission." *State v. Myers*, 923 P.2d 1024, 1043 (Kan. 1996). Subjecting some juveniles to mandatory registration, without any prerequisite determination of the likelihood of reoffending, triggers "consequences to sex offenders that go beyond the state's interest in public safety." *Doe v. State*, 189 P.3d 999, 1018 (Alaska 2008). In light of the totality of the statute's impositions, coupled with the mass publication of the juvenile's personal information, we find that mandatory registration for juveniles is excessive in light of its nonpunitive purpose.

h. *Balancing.* Considering all of the *Mendoza-Martinez* factors, we conclude that mandatory sex offender registration for juvenile offenders is sufficiently punitive to amount to imposing criminal punishment. The statute imposes an affirmative restraint akin to supervised probation. It mandates the mass dissemination of offender records that are historically kept confidential to promote the juvenile's potential for rehabilitation. And the sheer number of restrictions imposed on juveniles, given the demonstrated low juvenile recidivism rate, is excessive in light of the civil purpose of preventing multiple offenses.

2. *Cruel and unusual.* Upon finding that mandatory sex offender registration for juveniles is sufficiently punitive to warrant imposing constitutional safeguards, we next consider whether the practice goes so far as to violate the constitutional prohibition against cruel and unusual punishment. Importantly, that a civil regulatory regime is so excessive as to render it effectively punitive does not, in turn, suggest that it is so

egregious and nefarious that the punishment is impermissibly cruel and unusual.

T.H.'s cruel and unusual argument rests solely on his contention that the sex offender registry regime treats juveniles like him akin to adults, despite the "diminished culpability of juveniles." *Roper*, 543 U.S. at 571, 125 S. Ct. at 1196; *see also Lyle*, 854 N.W.2d at 398. He contends that, in the absence of any consideration of the mitigating factors outlined in *Miller*, mandatory registration for juveniles is grossly disproportionate and therefore violative of the Iowa and United States Constitutions. *See Miller v. Alabama*, 567 U.S. 460, 477–78, 132 S. Ct. 2455, 2468 (2012); *State v. Oliver*, 812 N.W.2d 636, 650 (Iowa 2012).

On our review of Chapters 232 and 692A above, we found that juveniles like T.H. are not in fact treated identically to adult offenders. Chapter 692A indeed strips juvenile courts of the discretion to suspend the initial registration requirement for certain aggravated juvenile offenders. Chapter 232, however, retains the juvenile court's authority to determine, at the time the dispositional order is terminated, whether it is in society's and the juvenile's best interests to continue the juvenile's sex offender registration. Accordingly, so long as a juvenile petitions to terminate his or her dispositional order prior to its expiration, the juvenile court retains authority to determine whether the child shall remain on the registry and abide by regime's requirements akin to an adult.

We find this cooperative regime strikes a reasonable balance between protecting society from the risk of aggravated offenders committing subsequent offenses and accounting for the youthful circumstances of juvenile offenders. The legislature has opted to place aggravated juvenile offenders on the sex offender registry throughout the

duration of their dispositional order, which is directly tied to the juvenile's period of rehabilitation. We find it is not excessively severe for the legislature to put additional constraints in place during the period when a juvenile adjudicated delinquent of an aggravated sexual offense is receiving reformative services, but has not yet been deemed rehabilitated. Because we find the statute's imposed punishment is not grossly disproportionate, "no further analysis is necessary." *Seering*, 701 N.W.2d at 670 (quoting *State v. Cronkhite*, 613 N.W.2d 664, 669 (Iowa 2000)).

## IV. Conclusion.

For the foregoing reasons, we affirm the decision of the court of appeals.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Appel, J., concurs in part and dissents in part, joined by Wiggins and Hecht, JJ. Mansfield, J., files a separate concurrence in part and dissent in part, joined by Waterman and Zager, JJ.

**APPEL, Justice (concurring in part and dissenting in part).**

The majority reasons automatic, mandatory registration for juvenile sex offenders is in fact punishment but holds that such registration does not amount to cruel and unusual punishment under article I, section 17 of the Iowa Constitution. I agree the registration is punishment, however, I respectfully dissent from the majority's holding that the registration is not cruel and unusual.

**I. Preliminary Concepts Regarding the Cruel and Unusual Punishment Clause.**

**A. Relevant Constitutional and Statutory Provisions.**

1. *Constitutional provisions.* The Eighth Amendment to the United States Constitution provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Similarly, article I, section 17 of the Iowa Constitution provides, "Excessive bail shall not be required; excessive fines shall not be imposed, and cruel and unusual punishment shall not be inflicted." Iowa Const. art. I, § 17.

T.H. does not suggest an analytical framework under the Iowa Constitution different from that under the United States Constitution. *See In re Det. of Matlock*, 860 N.W.2d 898, 903 (Iowa 2015). Even so, we can independently apply the established federal framework, even if the United States Constitution and the Iowa Constitution contain similar or identical language. *See Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 6 (Iowa 2004).

2. *Statutory provisions.* This case involves a number of statutory provisions that are relevant to T.H.'s constitutional challenge to automatic, mandatory sex offender registration. I delineate three

statutory provisions to provide context but bring attention to other relevant statutory provisions throughout this concurrence in part and dissent in part.

The juvenile court adjudicated T.H. delinquent for performing a sex act by force in violation of Iowa Code section 709.4(1)(*a*).  *See* Iowa Code § 709.4(1)(*a*) (2016) ("A person commits sexual abuse in the third degree when the person performs a sex act . . . by force or against the will of the other person . . . .").

Section 692A.102(1)(*c*)(10) classifies a conviction for "[s]exual abuse in the third degree in violation of section 709.4, subsection 1, paragraph "a", . . . if committed by a person fourteen years of age or older[,]" as a tier III offense.  *Id.* § 692A.102(1)(*c*)(10).

Section 692A.103(4) requires the court to order the juvenile "to register [as a sex offender] if the adjudication was for an offense committed by force" and the juvenile was at least fourteen years old at the time he or she committed the offense.  *Id.* § 692A.103(4).  In other words, the court has no discretion whatsoever in ordering a juvenile to register as a sex offender if it finds the applicable criteria.  In this case, the court found it had no discretion to waive the requirement of registration because T.H. was fourteen at the time of the offense and T.H. had committed the offense with force.

**B. Caselaw from Other Jurisdictions.**  The Ohio Supreme Court considered whether automatic, lifetime sex offender registration and notification requirements were cruel and unusual as applied to juveniles under the United States and Ohio Constitutions.[2]  *In re C.P.,* 967 N.E.2d

---

[2]The court also considered whether automatic, lifetime sex offender registration and notification requirements violated the defendant's due process rights. *In re C.P.,* 967 N.E.2d 729, 746–50 (Ohio 2012).

729, 737–46 (Ohio 2012). The court first undertook an examination under the Eighth Amendment of the United States Constitution by applying the two-step analysis from *Graham v. Florida*, 560 U.S. 48, 61, 130 S. Ct. 2011, 2022 (2010). *Id.* at 737–44. As to the first step, the court considered whether a national consensus against automatic, lifetime sex offender registration and notification requirements existed. *Id.* at 738–39. The court observed that the Federal Sex Offender Registration and Notification Act (SORNA) required states to conform to its provisions or risk loss of federal funds. *Id.* at 738. Many states, however, hesitated in complying with SORNA because it included juveniles on the registries. *Id.* at 738.

As to the second step, the court exercised its independent judgment to determine whether automatic, lifetime sex offender registration and notification requirements violated the Eighth Amendment. *Id.* at 740–44. The court considered the culpability of juveniles, the nature of the offense omitted, the severity of the punishment, and penological justifications. *Id.* First, it observed juveniles are less morally culpable and more capable of change than adult offenders. *Id.* at 740–41. The reprehensible acts of juveniles "are less likely to reveal an unredeemable corruptness." *Id.* at 740. Second, the court stated the punishment embodied in the applicable Ohio statute "appl[ied] to juveniles with a reduced degree of moral culpability" because "a juvenile who did not kill or intend to kill has 'twice diminished moral culpability' on account of his age and the nature of his crime." *Id.* at 741 (quoting *Graham*, 560 U.S. at 69, 130 S. Ct. at 2027).

Third, the court stated automatic, lifetime sex offender registration and notification requirements, with the possibility of the court lifting them after twenty-five years, were "especially harsh punishments for a

juvenile." *Id.* The court reasoned the punishment "is imposed at an age at which the character of the offender is *not yet fixed.*" *Id.* (emphasis added). Commenting on the stigma of the sex offender label, the court further reasoned, "Before a juvenile can even begin his adult life, . . . the world will know of his offense. . . . His potential will be squelched before it has a chance to show itself." *Id.*

Lastly, the court considered whether the theories of punishment justified imposing automatic, lifetime sex offender registration and notification requirements. *Id.* at 742–44. The court commented, "Notification and registration anchor the juvenile offender to his crime" instead of rehabilitating him. *Id.* at 742. The court reasoned the theory of retribution did not justify imposing such a serious punishment when juveniles were less culpable. *Id.* at 742–43. Additionally, the court discounted the theory of deterrence because juveniles were less likely to weigh future risks and consequences when making decisions. *Id.* at 743. As for the theory of rehabilitation, the court concluded automatic, lifetime sex offender registration and notification requirements thwarted the rehabilitative goals of the juvenile court system. *Id.* at 744. Specifically, publication of a juvenile's offense not only made reintegration into society more difficult but also inspired ostracism, vigilantism, and public shaming. *Id.* at 743–44. In sum, the court held the automatic imposition of lifetime sex offender registration and notification requirements violated the Eighth Amendment. *Id.* at 744.

Moreover, the court found the requirements unconstitutional under the prohibition against cruel and unusual punishment of the Ohio Constitution. *Id.* at 746. The court reasoned the requirements "frustrate[d] two of the fundamental elements of juvenile rehabilitation: confidentiality and the avoidance of stigma." *Id.* It stated,

"Confidentiality has always been at the heart of the juvenile justice system[,]" yet "the very public nature of the penalty" evidenced the lack of proportionality. *Id.* at 745. The court further reasoned juvenile judges possessed "absolutely no discretion" in imposing the requirements when "the decided emphasis [of juvenile courts] should be upon individual, corrective treatment." *Id.* (second quoting *In re Agler*, 249 N.E.2d 808, 810 (Ohio 1969)). The court therefore held the punishment lacked proportionality to the crime such that it "shock[ed] the sense of justice of the community." *See id.* at 746 (quoting *State v. Chaffin*, 282 N.E.2d 46, 49 (Ohio 1972)).

The Pennsylvania Supreme Court held that lifetime registration under SORNA as applied to juveniles was unconstitutional. *In re J.B.*, 107 A.3d 1, 20 (Pa. 2014). The reasoning of *J.B.* is instructive, although the court found a violation of due process rights and did not address whether lifetime registration violated the prohibition against cruel and unusual punishment. *See id.* at 14–20. The court reasoned "the irrebuttable presumption that all juvenile offenders 'pose a high risk of committing additional sexual offenses' . . . is not universally true and a reasonable alternative means currently exist for determining which juvenile offenders are likely to reoffend." *Id.* at 14 (quoting 42 Pa. Cons. Stat. § 9799.11(a)(4)). Notably, the court reasoned juvenile sex offenders did not have a meaningful opportunity to challenge the presumption because the delinquency hearing did not consider whether the individual offender was at risk of reoffending. *Id.* at 17. Rather, the delinquency adjudication automatically designated the juvenile as a sex offender with the accompanying faulty presumption. *Id.* The court also rejected the suggestion that a hearing twenty-five years in the future provided an opportunity to be heard on the presumption. *Id.*

Rejecting the presumption, the court stated research shows "the vast majority of juvenile offenders are unlikely to recidivate." *Id.* at 18. It also noted juveniles and adults are fundamentally different because of the malleability of juveniles to rehabilitation. *Id.* In light of the fact that "the concepts of balanced and restorative justice" guide the juvenile justice system, the court reasoned "automatic registration remove[d] the juvenile judges' ability to consider the rehabilitative prospects of individual juvenile sexual offenders." *Id.* Lastly, the court reasoned individualized risk assessment provided a reasonable alternative means of evaluating which offenders posed a high risk of recidivism. *Id.* at 19.

In a case addressing whether mandatory lifetime postrelease supervision of juvenile sex offenders was cruel and unusual, the Kansas Supreme Court held that such supervision violated the Eighth Amendment. *State v. Dull,* 351 P.3d 641, 660 (Kan. 2015). The reasoning in *Dull* is persuasive as to the issue of whether automatic, mandatory sex offender registration amounts to cruel and unusual punishment.

In *Dull,* the court found the defendant failed to show a national consensus against mandatory lifetime postrelease supervision for juvenile sex offenders. *Id.* The court, however, used independent judgment to conclude that such supervision was cruel and unusual for two reasons. *Id.* First, the diminished moral culpability of juveniles because of certain characteristics attributable to youth—"recklessness, immaturity, irresponsibility, impetuousness, and ill-considered decision making, along with their lower risks of recidivism"—tapered penological justifications. *Id.* Second, mandatory lifetime postrelease supervision was a "severe" sanction that "severely restricted" the juvenile's liberty. *Id.*

On the contrary, the Nebraska Supreme Court held lifetime community supervision was not cruel and unusual under the Eighth Amendment. *State v. Boche*, 885 N.W.2d 523, 538–39 (Neb. 2016). The court applied its reasoning to resolve the issue of whether lifetime community supervision was cruel and unusual under the Eighth Amendment to address the parallel issue of whether lifetime registration violated the same, even if such registration could be described as punishment as to the defendant. *See id.* at 532–38. As to the first issue, the court reasoned Nebraska's statutory scheme allowed for a level of supervision narrowly tailored to each offender and subject to yearly review, with a requirement that the conditions imposed be the least restrictive available based on the risk of recidivism and public safety. *Id.* at 537. Moreover, the offender could appeal the restrictions. *Id.* at 533. The court found Nebraska's statutory scheme was "individualized, adaptive, and incentivizes rehabilitation." *Id.* at 538.

As to the second issue, the court held lifetime registration was not punishment. *Id.* at 531–32. The court declined to revisit *State v. Worm*, 680 N.W.2d 151 (Neb. 2004), on this issue. *Id.* Moreover, the court discounted the defendant's brief citing studies examining the recidivism rates of juvenile sex offenders because the defendant did not present the studies to the district court, such that neither that court nor the supreme court had evidence before it concerning his argument. *Id.* at 531.

Other jurisdictions have also found that sex offender registration is not cruel and unusual. *See United States v. Juvenile Male*, 670 F.3d 999, 1010 (9th Cir. 2012) (holding the potential shame and humiliation resulting from the twenty-five-year registration did not satisfy the high standard necessary to violate the Eighth Amendment); *In re J.C.*, 221

Cal. Rptr. 3d 579, 591 (Ct. App. 2017) (holding juvenile sex offender registration was not punishment because the offender "failed to show the limited degree of public disclosure applicable to juveniles required to register pursuant to [the applicable statute] is sufficiently burdensome to distinguish it from that applicable to adult offenders"); *In re J.O.*, 383 P.3d 69, 75 (Colo. App. 2015) (holding juvenile sex offender registration was not punishment in the first instance and thus declining to address whether such registration was cruel and unusual under the Eighth Amendment); *In re J.W.*, 787 N.E.2d 747, 762 (Ill. 2003) (holding lifetime juvenile sex-offender registration did not constitute cruel and unusual punishment because of the limited dissemination of the offender's information). *But see People v. Dipiazza*, 778 N.W.2d 264, 273–74 (Mich. Ct. App. 2009) (holding ten-year sex offender registration requirement was cruel and unusual as applied to an eighteen-year-old defendant in a consensual sexual relationship with a teen who was almost fifteen years old).

**II. Analysis of the Cruel and Unusual Punishment Clause as Applied to This Case.**

The underlying principle of the Cruel and Unusual Punishment Clause is the "bedrock rule of law that punishment should fit the crime." *State v. Bruegger*, 773 N.W.2d 862, 872 (Iowa 2009). Based on this principle, I would find automatic, mandatory sex offender registration as applied to juveniles violates the cruel and unusual punishment clause of the Iowa Constitution because of the lack of proportionality between the punishment and the offense committed.[3]

---

[3]That I addressed the issue of whether automatic, mandatory sex offender registration is cruel and unusual under the Iowa Constitution does not preclude the finding of a violation under the United States Constitution.

**A. Low Recidivism and Sexual Reoffense Rates of Juvenile Sex Offenders Coupled with Their Responsiveness to Rehabilitative Treatment.** The risk of juvenile sex offenders generally recidivating and sexually reoffending are low. Empirical studies have been dispelling the fear-based myth that juvenile sex offenders have a propensity to commit sex offenses as adults. *See* Human Rights Watch, *Raised on the Registry: The Irreparable Harm of Placing Children on Sex Offender Registries in the U.S.* 30–31 (2013), https://www.hrw.org/sites/default/files/reports/us0513_ForUpload_1.pdf [hereinafter *Raised on the Registry*]; Ashley R. Brost & Annick-Marie S. Jordan, *Punishment That Does Not Fit the Crime: The Unconstitutional Practice of Placing Youth on Sex Offender Registries*, 62 S.D. L. Rev. 806, 809 (2017) [hereinafter Brost & Jordan]; Amanda M. Fanniff et al., *Juveniles Adjudicated for Sexual Offenses: Fallacies, Facts, and Faulty Policy*, 88 Temp. L. Rev. 789, 793–95 (2016).

In *State v. Graham*, we acknowledged "most juvenile offenders who commit sex offenses will outgrow their behavior and . . . juveniles adjudicated delinquent for sex offenses have extremely low rates of recidivism generally and even lower rates of sexual reoffending." 897 N.W.2d 476, 484 (Iowa 2017). We charted comprehensive studies finding that juveniles posed little risk of recidivism. *Id.* at 484–85 (citing Michael F. Caldwell et al., *An Examination of the Sex-Offender Registration and Notification Act as Applied to Juveniles: Evaluating the Ability to Predict Sexual Recidivism*, 14 Psychol. Pub. Pol'y & L. 89, 96–97, 101 (2008); Elizabeth J. Letourneau & Kevin S. Armstrong, *Recidivism Rates for Registered and Nonregistered Juvenile Sex Offenders*, 20 Sexual Abuse: J. Res. & Treatment 393, 400 (2008); Franklin E. Zimring et al., *Investigating the Continuity of Sex Offending: Evidence from the Second Philadelphia Birth Cohort*, 26 Just. Q. 58 (2009); Franklin E.

Zimring et al., *Sexual Delinquency in Racine: Does Early Sex Offending Predict Later Sex Offending in Youth and Young Adulthood?*, 6 Criminology & Pub. Pol'y 507 (2007)); *see also* Amy E. Halbrook, *Juvenile Pariahs*, 65 Hastings L.J. 1, 13–15 (2013) [hereinafter Halbrook] (explaining in depth the Caldwell, Letourneau, and Zimring studies that found low risks of recidivism and sexual reoffending among juvenile sex offenders).

The Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking of the United States Department of Justice recently published a research brief reviewing the state of research on juvenile sexual reoffending and assessing the current practice in juvenile sex offender management. Christopher Lobanov-Rostovsky, U.S. Dep't of Justice, *Recidivism of Juveniles Who Commit Sexual Offenses* (July 2015), https://smart.gov/pdfs/JuvenileRecidivism.pdf. The brief reached some key conclusions from the collected empirical evidence. *Id.* at 5.

> First, the observed sexual recidivism rates of juveniles who commit sexual offenses range from about 7 to 13 percent after 59 months, depending on the study. *Recidivism rates for juveniles who commit sexual offenses are general lower than those observed for adult sex offenders. . . . [R]ecidivism data suggest that there may be fundamental differences between juveniles who commit sexual offenses and adult sexual offenders, particularly in their propensity to sexually reoffend.*
>
> Second, a relatively small percentage of juveniles who commit a sexual offense will sexually reoffend as adults. The message for policymakers is that *juveniles who commit sexual offenses are not the same as adult sexual offenders, and that all juveniles who commit a sexual offense do not go on to sexually offend later in life. . . .*
>
> Finally, juveniles who commit sexual offenses have higher rates of general recidivism than sexual recidivism. This suggests that juveniles who commit sexual offenses may

have more in common with other juveniles who commit delinquent acts than with adult sexual offenders . . . .

*Id.* (emphases added).

Additionally, juveniles are more responsive to treatment and rehabilitation than adult sex offenders. Carole J. Petersen & Susan M. Chandler, *Sex Offender Registration and the Convention on the Rights of the Child: Legal and Policy Implications of Registering Juvenile Sex Offenders*, 3 Wm. & Mary Pol'y Rev. 1, 31 (2011). Juvenile sex offenders who receive treatment for their sexual offenses exhibit lower recidivism rates than both treated adult sex offenders and untreated juvenile sex offenders. Phoebe Geer, *Justice Served? The High Cost of Juvenile Sex Offender Registration*, 27 Dev. Mental Health L. 34, 42 (2008) [hereinafter Geer].

Juvenile sex offenses do not necessarily signify permanent sexual deviance but appear to be exploratory in nature and a product of misplaced sexual curiosity. *Id.*; *see* Catherine L. Carpenter, *Throwaway Children: The Tragic Consequences of a False Narrative*, 45 Sw. L. Rev. 461, 492 (2016) [hereinafter Carpenter] ("[P]oor social competency skills and deficits in self-esteem can best explain sexual deviance in children, rather than paraphilic interests and psychopathic characteristics that are more common in adult offenders." (quoting Ass'n for the Treatment of Sexual Abusers, *Adolescents Who Have Engaged in Sexually Abusive Behavior: Effective Policies and Practices*, (Oct. 30, 2012), www.atsa.com/pdfs/Policy/AdolescentsEngagedSexuallyAbusiveBehavior. pdf [https://perma.cc/5VKV-6SPD])).

The United States Supreme Court has recognized the malleability of juveniles and their capacity for change in the landmark *Roper–Graham–Miller* trio. *E.g.*, *Miller v. Alabama*, 567 U.S. 460, 471–73, 132 S. Ct. 2455, 2464–65 (2012); *Graham*, 560 U.S. at 68, 130 S. Ct. at

2026; *Roper v. Simmons*, 543 U.S. 551, 569–70, 125 S. Ct. 1183, 1195 (2005). "[C]hildren are constitutionally different from adults . . . ." *Miller*, 567 U.S. at 471, 132 S. Ct. at 2464. Thus, juveniles "are less deserving of the most severe punishments" because of their "diminished culpability and greater prospects for reform." *Id.* (first quoting *Graham*, 560 U.S. at 68, 130 S. Ct. at 2026). The Supreme Court relied on three points of difference between juveniles and adults. *Id.* First, juveniles "have a 'lack of maturity and an underdeveloped sense of responsibility.'" *Id.* (quoting *Roper*, 543 U.S. at 569, 125 S. Ct. at 1195). Second, they "are more vulnerable . . . to negative influences and outside pressures." *Id.* (quoting *Roper*, 543 U.S. at 569, 125 S. Ct. at 1195). Lastly, their "character is not as 'well formed' as an adult's; his [or her] traits are 'less fixed' and his [or her] actions less likely to be 'evidence of irretrievabl[e] deprav[ity].'" *Id.* (alterations in original) (quoting *Roper*, 543 U.S. at 570, 125 S. Ct. at 1195). Furthermore, "[w]e have emphasized that the constitutionally significant distinction between adults and children is applicable to all crimes, not just some crimes." *State v. Crooks*, 911 N.W.2d 153, 178 (Iowa 2018) (Appel, J., concurring in part and dissenting in part).

Accordingly, because of a low risk of recidivism in tandem with responsiveness to rehabilitative treatment, the current policies and practices designed to prevent adult sexual reoffending lack proportionality between the crime and the punishment as applied to juveniles.

**B. Particularly Harsh Consequences on Youth.** Although the risk of reoffending is low, the consequences that juveniles encounter are especially severe. They encounter "incredible barriers to housing, employment, and education." Brost & Jordan, 62 S.D. L. Rev. at 820;

*accord* Stand Up for What's Right and Just (SURJ), Nat'l Juvenile Justice Network, *The Case for Modifying Juvenile Sex Offender Registry Requirements in Delaware* 3 (July 2011), http://www.njjn.org/uploads/digital-library/DE_Juvenile-Sex-Offender-Research-Brief_SURJ_7-30-11.pdf [https://perma.cc/6HQA-WV24].  The label of sexual offender branded like an indelible scarlet letter makes it difficult for juveniles on the registry to integrate into society and become a productive, contributing member of society.  *See People ex rel. J.L.*, 800 N.W.2d 720, 725 (S.D. 2011) (Meierhenry, J., concurring specially); Carpenter, 45 Sw. L. Rev. at 472 ("Without secure prospects for employment, education, or a stable living situation, children labeled as sex offenders are destined to spiral downward."  (Footnotes omitted.)).

The adverse psychological damage to a child's identity formation and social development cannot be understated.  *See Raised on the Registry* 50–55.  Juveniles face stigmatization, shame, and isolation from family and friends.  *Id.* at 50–51; *see generally* Stacey Hiller, *The Problem with Juvenile Sex Offender Registration: The Detrimental Effects of Public Disclosure*, 7 B.U. Pub. Int. L.J. 271, 292 (1998).  At least twenty percent of juveniles on the registry will attempt suicide because of social stigma and psychological harm.  Brost & Jordan, 62 S.D. L. Rev. at 823.

Among 281 juvenile sex offenders and family members of fifteen additional juvenile sex offenders interviewed by the Human Rights Watch, 250 of them (84.5 percent) described feeling depressed and isolated.  *Raised on the Registry* 51.  They also had difficulty in developing relationships and had thoughts of suicide.  *Id.*  In fact, fifty-eight individuals (19.6 percent) attempted suicide.  *Id.*

Phoebe Geer described the damaging impact of registration and notification requirements as well as the stigmatization of the sex offender label:

> Operating directly contrary to the rehabilitative goals of the juvenile justice system, sex offender registration and notification laws can *publicly and permanently mark juvenile sex offenders as deviant criminals who should be feared and shunned.* While many juvenile proceedings are confidential and sealed, sex offender registration and notification laws, by creating a public record, *place the sexual offense of a juvenile directly and prominently in the public eye.*
>
> . . . [F]ew labels are as damaging in today's society as "convicted sex offender." Sex offenders are, as one scholar put it, "the lepers of the criminal justice system," with juveniles listed in the sex offender registry sharing this characterization. The state's interest in and responsibility for a juvenile's well-being and rehabilitation is not promoted by a practice that makes a juvenile's sex offenses public.

Geer, 27 Dev. Mental Health L. at 49 (emphases added) (quoting Robert E. Shepherd, *Advocating for the Juvenile Sex Offender, Part 2,* 21 Crim. Just. 52, 53 (2007)).

Juvenile sex offenders on the registry often encounter vigilante attacks. The Human Rights Watch reported that among 296 cases that it had examined, 154 (fifty-two percent) juvenile sex offenders experienced either violence or threats of violence against themselves or family members because of their registration. *Raised on the Registry* 56.

Consequences of the juvenile's registration status also attaches to the whole family. Halbrook, 65 Hastings L.J. at 18; *Raised on the Registry* 60–64. Family members of registrants encounter "isolation, threats, harassment, stress, and housing displacement." Halbrook, 65 Hastings L.J. at 18.

Additionally, pursuant to Iowa Code chapter 692A, juvenile sex offenders must adhere to rigid restrictions on movement. For example,

T.H. must notify *in person* the county sheriff within five business days if he changes his residence, employment, or school. Iowa Code § 692A.104(1)–(2) (emphasis added). T.H. must appear *in person* to verify the location of his residence, employment, and school every three months. *Id.* § 692A.108(1)(*c*).

The statute also imposes a number of exclusion zones. Except for the school he attends, T.H. may not be present upon, nor loiter within 300 feet of, the property of an elementary or secondary school. *Id.* § 692A.113(1)(*a*)–(*b*). Additionally, T.H. may not be present upon (absent prior written permission by the library administrator), nor loiter within 300 feet of, the property of a public library. *Id.* § 692A.113(1)(*f*)–(*g*). T.H. may not be present upon (unless he receives written permission from the child care facility), nor loiter within 300 feet of, the property of a child care facility. *Id.* § 692A.113(1)(*d*)–(*e*). He may not be present upon, nor loiter within 300 feet of, "any place intended primarily for the use of minors." *Id.* § 692A.113(1)(*h*). T.H. may not loiter on the premises of any facility for dependent adults and may not be present at an event that provides services or programming for dependent adults. *Id.* § 692A.115(1).

Furthermore, the statute imposes employment restrictions. *See id.* §§ 692A.113(3)(*a*)–(*e*), .115. For example, while on the registry, T.H. may not work or volunteer at a "public or nonpublic elementary or secondary school, child care facility, or public library." *Id.* § 692A.113(3)(*c*). He may not work or volunteer at "any place intended primarily for use by minors including but not limited to a playground, a children's play area, recreational or sport-related activity area, a swimming or wading pool, or a beach." *Id.* § 692A.113(3)(*d*).

Lastly, the statute imposes residency restrictions. If the court requires T.H. to register after becoming an adult, he may not reside within 2000 feet of a school or child care facility. *Id.* § 692A.114(2).

The punishment is especially severe because confidentiality is nonexistent. The public may view T.H.'s personal information on the sex offender registry website. *Id.* § 692A.121(1). The registry contains T.H.'s full name; photographs; date of birth; home address; and physical description, including scars, marks, or tattoos. *Id.* § 692A.121(2)(*b*)(1)(a)–(e). Furthermore, the registry provides the statutory citation and text of his offense. *Id.* § 692A.121(2)(*b*)(1)(f). It also provides information on whether T.H. is subject to residency restrictions and exclusion zones. *Id.* § 692A.121(2)(*b*)(1)(g)–(h). The public can also request additional information concerning T.H. by contacting the county sheriff's office and simply providing T.H.'s name and T.H.'s date of birth. *Id.* § 692A.121(5)(*a*). Additional information runs the gamut—a list of schools T.H. attended, employment information, locations and dates of any temporary lodging, and his vehicle information. *Id.* § 692A.121(5)(*b*).

In sum, registration and notification requirements nullify the private nature of our juvenile court system. Moreover, the stigmatization of sexual offenders perpetuates the mistakes of youth into the permanence of adulthood. Accordingly, I would find the punishment is disproportionate to the crime, especially in light of the diminished moral culpability of juveniles. *See Crooks*, 911 N.W.2d at 179 ("[C]ulpability is a cornerstone of proportional punishment.").

**C. No Meaningful Opportunity to Show Rehabilitation.** The purported principal goal of the juvenile justice system is rehabilitation rather than punishment. *McKeiver v. Pennsylvania,* 403 U.S. 528, 544

n.5, 91 S. Ct. 1976, 1986 n.5 (1971). Yet juvenile sex offenders have no meaningful opportunity to show rehabilitation.

Iowa Code section 692A.128 provides an escape valve in theory but not in practice. A court may not grant an application to modify the registration requirements unless the application meets all of the following criteria:

> *a.* The date of the commencement of the requirement to register occurred at least two years prior to the filing of the application for a tier I offender and five years prior to the filing of the application for a tier II or III offender.

> *b.* The sex offender has successfully completed all sex offender treatment programs that have been required.

> *c.* A risk assessment has been completed and the sex offender was classified as a low risk to reoffend. The risk assessment used to assess an offender as a low risk to reoffend shall be a validated risk assessment approved by the department of corrections.

> *d.* The sex offender is not incarcerated when the application is filed.

> *e.* The director of the judicial district department of correctional services supervising the sex offender, or the director's designee, stipulates to the modification, and a certified copy of the stipulation is attached to the application.

Iowa Code § 692A.128(2)(*a*)–(*e*).

Section 692A.128 does not provide a realistic chance for release. Although section 692A.128 provides a purported escape valve, this escape valve is inadequate because it requires the approval of the director of the judicial district department of correctional services. A unilateral decision by the director nullifies any meaningful opportunity to be heard on the issue of rehabilitation because the director's stipulation is likely unforthcoming. Section 692A.128(6) exempts the requirement of this stipulation if the offender is no longer under the supervision of the

juvenile court or a judicial district department of correctional services. *Id.* § 692A.128(6). This exemption does not change the dynamics of the odds stacked up against the offender because it requires an additional hurdle: the agreement of the department of corrections to perform a risk assessment on the offender. *See id.* As with the stipulation, such an agreement is within the unilateral authority of the department of corrections.

Furthermore, section 692A.128 mandates the completion of all required sex offender treatment programs. Yet section 692A.103(4) requires juvenile judges to impose mandatory, automatic sex offender registration without any individualized risk assessment *prior* to the imposition of registration requirements. Section 692A.103(4) does not give discretion to juvenile judges to examine the individual's prior criminal record, evaluate his or her personality and social history, assess reports of any psychiatric examinations of him or her, and any other pertinent information in relation to whether to impose the requirements. Without such an individualized risk assessment, it is rather difficult to know which treatment program a juvenile sex offender should be required to undergo.

I now turn to Iowa Code chapter 232. Through its interpretation of this chapter, the majority reasons juveniles have an opportunity to be heard on the question of mandatory registration at the close of jurisdiction of the juvenile court. Specifically, section 232.54(1)(*i*) provides,

> With respect to a dispositional order requiring a child to register as a sex offender pursuant to chapter 692A, the juvenile court shall determine whether the child shall remain on the sex offender registry *prior to termination of the dispositional order.*

*Id.* § 232.54(1)(*i*) (emphasis added). This purported escape valve, however, provides for a hearing at the wrong juncture. The court should hold a hearing concerning rehabilitation *after* the juvenile has an opportunity to develop maturity and present corresponding evidence of rehabilitation and mitigating circumstances. Ordinarily, this should occur sometime after the child reaches the age of twenty-five when full maturity and character formation is ordinarily complete. A court may deny the opportunity to show rehabilitation and maturity at the early age of eighteen, prior to reaching full maturity, only upon a showing of incorrigibility and irredeemable corruption. The record shows no evidence that T.H. received a *Miller*-type hearing showing that he is incorrigible and irredeemably corrupt.

Our juvenile justice system should not forget the principle on which it was founded—juveniles are constitutionally different from adults. Moreover, "seek[ing] to hold juveniles accountable for their actions and to protect the public does not negate the concept that rehabilitation remains a more important consideration in the juvenile justice system than in the criminal justice system . . . ." *People v. Taylor*, 850 N.E.2d 134, 141 (Ill. 2006); *accord In re S.K.*, 587 N.W.2d 740, 742 (S.D. 1999) (stating the purpose of the juvenile court system is to rehabilitate, not punish). Juvenile sex offenders should have a meaningful opportunity to demonstrate rehabilitation and maturity after their characters are fully formed.

### III. Conclusion.

Based on the foregoing reasons, I would vacate the decision of the court of appeals, vacate the judgment of the district court, and remand.

Wiggins and Hecht, JJ., join this concurrence in part and dissent in part.

**MANSFIELD, Justice (concurring in part and dissenting in part).**

I concur in parts III.A and III.B of the court's opinion and in part III.C.2's conclusion that Iowa's sex offender registration requirements are not unconstitutional as applied to juveniles. However, I cannot join much of the discussion in part III.C.1.

We have held that Iowa's sex offender registration laws do not constitute punishment under either the United States or the Iowa Constitutions. *See Formaro v. Polk County*, 773 N.W.2d 834, 843–44 (Iowa 2009); *State v. Seering*, 701 N.W.2d 655, 666–68 (Iowa 2005). I do not agree that registration which is nonpunitive for adults becomes punitive when applied in a more lenient way to juveniles.[4]

## I. No Caselaw Supports the Majority's Distinction.

The majority cites no cases supporting a constitutional distinction between registration of adult sex offenders and registration of juvenile sex offenders. There are many cases to the contrary.

A California appellate court has declined to hold that juvenile sex offender registration, as opposed to adult sex offender registration, constitutes punishment. *In re J.C.*, 221 Cal. Rptr. 3d 579, 593 (Ct. App. 2017). There, the court rejected the juvenile's argument that "children were different" and that registration of juveniles could still be punishment notwithstanding a previous finding under both the State and the Federal Constitutions that registration of adults was not. *Id.* at 588–91 (citing *In re Alva*, 92 P.3d 311, 313 (2004)). Although the court

---

[4]As noted by the majority, one key distinction is that the juvenile court has discretion to terminate the registration requirement at the termination of the dispositional order. *See* Iowa Code § 232.54(1)(*i*) (2016). That dispositional order will terminate no later than January 2019, when T.H. turns eighteen. The juvenile court will have discretion to terminate T.H.'s registration at that point.

noted juvenile identifying information was not published on the registry website, other disclosure requirements still applied to juveniles. *Id.* at 590–91.

Likewise, the Nebraska Supreme Court saw "no principled reason" to depart from its holding that lifetime sex offender registration was not punishment, just because the offense was committed by a juvenile. *See State v. Boche*, 885 N.W.2d 523, 531–32 (Neb. 2016). It added, "Other jurisdictions which have considered the issue as applied to juveniles have reached the same conclusion." *Id.* at 532.

The Illinois Supreme Court similarly rejected a claim that the sex offender registry of juveniles involved punishment. *In re J.W.*, 787 N.E.2d 747, 762 (Ill. 2003). The court had previously held that the registration requirements did not constitute punishment as applied to adults. *See id.* The court was, however, "not persuaded that requiring a juvenile sex offender to register and allowing a very limited public access to notification concerning the juvenile's status as a sex offender compels a different result." *Id.*

The South Carolina Supreme Court held in *In re Justin B.* that mandatory sex offender registration was nonpunitive, even as applied to juveniles. 799 S.E.2d 675, 679 (S.C. 2017). According to the court,

> The purpose of the sex offender registry has nothing to do with retribution, and any deterrent effect of registration derives from the availability of information, not from punishment. Instead, the purpose of the registry and the electronic monitoring requirement is to protect the public and aid law enforcement.

*Id.* There, the registration requirements applied equally to all offenders "convicted or declared delinquent for criminal sexual conduct with a minor in the first degree," "regardless of age." *Id.* at 677.

In Mississippi, the state supreme court upheld the required registration of a juvenile sex offender. *L.B.C. v. Forrest Cty. Youth Ct.*, ___ So. 3d ___, ___, 2017 WL 5897905, at *6 (Miss. 2017) (en banc). There, the court noted that courts have no discretion regarding whether a qualified delinquent must register as a sex offender: "As long as the delinquent is fourteen years old and committed an offense that involved the use of force, the delinquent is required to register." *Id.* at *5. Further, there were no confidentiality distinctions between juveniles and adults who must register; the names and addresses of offending juveniles were not confidential so that they may be used for purposes of the registry. *Id.* The court concluded that "the purpose of the Mississippi Sex Offenders Registration law is to assist law enforcement and protect the community and vulnerable populations." *Id.* The court continued, "The requirement to register as a sex offender does not punish the registrant but protects the public from repeat offenses. This purpose is no less a valid concern with juvenile delinquents." *Id.*

In *In re J.O.*, the Colorado Court of Appeals found that the statutory sex offender registration of a juvenile did not amount to punishment. 383 P.3d 69, 75 (Colo. App. 2015). Noting that the juvenile could petition to be removed from the registry after successfully completing and being discharged from his sentence, the court "decline[d] to depart from Colorado cases holding that sex offender registration . . .— even as applied to juveniles—does not constitute punishment." *Id.*

From reading the majority opinion, one might think that a decision of the Maryland Court of Special Appeals supports the majority's reasoning. *See In re Nick H.*, 123 A.3d 229 (Md. Ct. Spec. App. 2015). However, that case actually found that registration of juvenile sex offenders was not punitive. *Id.* at 250–51.

It is true that in some of the foregoing states, information about registered *juvenile* sex offenders is not readily available to the public. But in others, it is, just as in Iowa. *See Justin B.*, 799 S.E.2d at 680; *L.B.C.*, ___ So. 3d at ___, 2017 WL 5897905, at *5.

I might not make the same policy choice as our legislature, but that is not the issue. As noted by the majority, "The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Smith v. Doe*, 538 U.S. 84, 105, 123 S. Ct. 1140, 1154 (2003).[5]

Including both adults and juveniles who commit forcible sex offenses on the publicly available sex offender registry meets the foregoing standard. I suspect Iowans don't care whether a confirmed child molester committed the offense at the age of nineteen or seventeen. If the person is living in their neighborhood, they want to know that. As I've already noted, the legislature has provided the juvenile court with discretion to remove the juvenile from the registry at the termination of the dispositional order.

## II. Social Science Is an Insufficient Basis for the Majority's Distinction.

I would be more cautious than the majority in relying on social science. Whenever we do this, there is a serious danger we will get it wrong, i.e., that we will do exactly what we accuse the United States Supreme Court of having done.

---

[5]Justice Appel's dissent in part discusses one state where the supreme court found *both adult and juvenile* sex offender registration to be punitive. *In re C.P.*, 967 N.E.2d 729, 734 (Ohio 2012). Like the majority, though, the dissent cites no jurisdiction where the courts have found registration to be regulatory for adults and punitive for juveniles.

The majority places the most reliance on a 2013 report issued by the Division of Criminal and Juvenile Justice Planning of the Iowa Department of Human Rights. Div. of Criminal & Juvenile Justice Planning, Iowa Dep't of Human Rights, *Iowa Sex Offender Research Council Report to the Iowa General Assembly* (Jan. 2013), https://humanrights.Iowa.gov /sites/default/files/media/SORC_1-15-13_Final_Report_%5B1%5D.pdf [https://web.archive.org/web/20170323233135/https://humanrights.iowa.gov/sites/default/files/media/SORC_1-15-13_Final_Report[1].pdf].

I have found this division's reports helpful in the past, but only when they are quoted and summarized accurately. That isn't what the majority has done here.

First, the majority claims that "juvenile sex offenders exhibit drastically lower recividism rates than their adult counterparts." The report doesn't actually say this. Rather, it states, "Much research has been conducted on the differences between juvenile and adult sex offenders, *some of which suggests* that juveniles exhibit lower recidivism rates and respond better to sex offender treatment than adults." *Id.* at 12 (emphasis added).

Second, the majority includes the following quotation from the report: "[S]tudies have found extremely low rates of sexual reoffending for juveniles and that sexual reoffending rates are much lower than non-sexual re-offenses even among high-risk juveniles committed to correctional facilities." The majority, however, omits a key word from the quotation—"some." The actual text reads, "*Some* studies have found extremely low rates of sexual reoffending for juveniles and that sexual reoffending rates are much lower than non-sexual re-offenses even

among high-risk juveniles committed to correctional facilities." *Id.* (emphasis added) (citations omitted).

Third, according to the majority, the report indicates that multiple studies have shown no significant difference in reoffense rates between registered and nonregistered juveniles. This does seem to be a fair summary of the report. However, the report also seems to reach the same conclusion about *adult* registration—i.e., that it does not reduce subsequent offending. *Id.* at 13. The majority doesn't mention this.

Social science has a role in judicial decision-making, but that role should be very limited when we are deciding where a constitutional boundary lies. For the most part, the executive and legislative branches of government are better at evaluating and acting on social science. The report discussed by the majority was, in fact, authored by the executive branch of Iowa's government and intended to be read by the legislative branch.[6]

### III. The Majority Opinion Will Have Collateral Consequences.

Lastly, today's decision that juvenile sex offender registration is punitive necessarily means that the Ex Post Facto Clause applies. *See* U.S. Const. art. I, § 9, cl. 3; Iowa Const. art. I, § 21. Therefore, in Iowa, a juvenile can no longer be subjected to a new or different registration requirement enacted after his or her underlying conviction. Prosecutors,

---

[6]The majority may well be right that juvenile sex offenders are statistically less prone than adult sex offenders to reoffend. According to a more recent survey of studies, "Recidivism rates for juveniles who commit sexual offenses are generally lower than those observed for adult sexual offenders." Christopher Lobanov-Rostovsky, U.S. Dep't of Justice, *Recidivism of Juveniles Who Commit Sexual Offenses* 5 (July 2015), https:// www.smart.gov/pdfs/JuvenileRecidivism.pdf. (Justice Appel's dissent in part cites this particular compendium.) My point is that we are not equipped to weigh all these studies nor should we be using our interpretation of them as a basis for drawing a constitutional line in the sand.

defense lawyers, and trial judges will need to sort through this consequence of today's ruling.

For these reasons, I too would affirm the district court and the court of appeals, but I cannot join the court's opinion in its entirety.

Waterman and Zager, JJ., join this concurrence in part and dissent in part.